UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CONNIE CLAY, GUARDIAN OF THE ESTATE OF JOSHUA WADE BALL, A MINOR, § § § § § Plaintiff, § § v. § § LIFE INSURANCE COMPANY OF § NORTH AMERICA, TRUSTEE OF THE § GROUP INSURANCE TRUST FOR THE § EMPLOYERS IN THE FINANCE § INSURANCE AND REAL ESTATE § INDUSTRY, § § Defendant. § | CIVIL ACTION NO. H-10-cv-4961 |

## MEMORANDUM AND ORDER

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. No. 16) and Plaintiff's Motion for Summary Judgment (Doc. No. 17). After considering the motions, all responses thereto, and the applicable law, the Court finds that Defendant's Motion should be granted and Plaintiff's Motion should be denied.

### I. BACKGROUND

This action involves the denial of a claim for basic and supplemental accidental death benefits under a policy governed by the Employee Retirement Employment Retirement Income Security Act ("ERISA") and administered by Defendant Life Insurance Company of North America ("LINA"). Plaintiff Connie Clay brings this action on behalf of her minor son, Joshua Wade Ball, for wrongful denial of benefits under § 1132 of ERISA. 29 U.S.C. § 1132. Joshua's father, Gregory R. Ball, was employed by Realogy, who maintained a life and accident insurance policy through Defendant for its employees. By virtue of his employment with Realogy, Mr.

1

Ball was enrolled in Group Accident Policy No. OK-980070 through Defendant, which provided him with $75,000 in basic accident insurance benefits in the event of a covered accident. (Administrative R., Doc. No. 15, at 6.)  Mr. Ball also applied for a supplemental policy that would provide an additional $250,000 in accident insurance benefits.  (*Id.*)

### A.  Mr. Ball's Death and Subsequent Investigations

Mr. Ball was found floating on his back in a swimming pool at 12:33 p.m. on October 13, 2007.  (*Id.* at 147–49.)  He was 48 years old.  (*Id.* at 148.)  The witness who first found Mr. Ball called police and EMS, who arrived on the scene shortly thereafter and pulled him out of the pool to attempt CPR.  Mr. Ball was transported to the hospital in an ambulance, and he was pronounced dead shortly after arriving, at 1:19 p.m.  (*Id.* at 149.)

The officer noted that there were no signs of struggle at the scene and no signs of trauma to Mr. Ball.  (*Id.* at 148.)  The swimming pool was only 5 feet deep at its deepest point, and Mr. Ball was approximately 5'10", according to the police report.[1]  (*Id.*)  The ambulance crew's records also indicated that Mr. Ball's blood sugar level was at 24 when they arrived at the scene, which required the paramedics to administer D50 (dextrose).  (*Id.* at 199–200.)

The Harris County Medical Examiner's Office performed an autopsy on October 14, 2007, determining that the cause of death was "drowning" and the manner of death was "accident."  (*Id.* at 39.)  Hypertensive and atherosclerotic cardiovascular disease and diabetes mellitus are listed as "contributory causes" of the death.  (*Id.*)  The report notes that his heart weighed 490 grams.  (*Id.* at 42.)  The right coronary artery had atherosclerotic stenosis of approximately 60 percent, and the left coronary artery had atherosclerotic stenosis of approximately 40 percent in the anterior descending branch and 80 percent in the circumflex

---

[1] The autopsy noted that he was 5'7".  (Administrative R. at 40.)  Plaintiff did not challenge Defendant's decision, either in her motion or in her appeal at the administrative level, on the basis that Mr. Ball was not tall enough to stand in the pool.

branch. (*Id.*) The report also noted a "[h]istory of recent alcohol ingestion, with blood alcohol level below detectable limits of toxicologic testing." (*Id.* at 44.) A separate blood sample analysis showed less than .10 mg/L of benzoylecgonine, a cocaine metabolite. (*Id.* at 46.)

An amendment to the Certificate of Death was certified on March 6, 2008, after the autopsy report was finalized. (*Id.* at 37.) It adopted the findings of the medical examiner, noting the "immediate cause of death" as "drowning" and listing "other significant conditions contributing to death" as "Hypertensive and Atherosclerotic Cardiovascular Disease; Diabetes Mellitus." (*Id.*)

### B. Policy Provisions

The Accident Policy defines a "Covered Accident" as:

A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
1. occurs while the Covered Person is insured under this Policy;
2. is not contributed by disease, Sickness[2], mental or bodily infirmity;
3. is not otherwise excluded under the terms of this Policy.

(*Id.* at 643.) The Policy also states that benefits will not be paid for any loss "which, directly, or indirectly, in whole or in part, is caused by or results from . . . 7. Sickness, disease, bodily or mental infirmity . . . [or] 11. voluntary ingestion of any narcotic, drug, poison, gas or fumes, unless prescribed or taken under the direction of a Physician and taken in accordance with the prescribed dosage." (*Id.* at 647.)

### C. Initial Denial of Benefits

A human resources associate with Mr. Ball's former employer forwarded Plaintiff's claim for life and accidental death insurance benefits to Defendant on October 18, 2007. (*Id.* at

---

[2] Presumably, the word "Sickness" is defined in the policy, as it is capitalized each time it is used. However, the Administrative Record filed as Doc. No. 15 is missing page 16 of the policy, which is where "Sickness" may be defined. (*See* Doc. No. 15 at 644–45.) Because Plaintiff does not challenge Defendant's ruling on this basis, however, the Court need not address it.

623.) On October 31, 2007, a LINA life claim specialist explained to Plaintiff's attorney that Defendant could not process Plaintiff's claim until Defendant received the death certificate. (*Id.* at 609.) Plaintiff's attorney forwarded the death certificate to Defendant on May 1, 2008. (*Id.* 581–84.) Defendant's accident claim specialist on this case also requested copies of the police report, EMS report, attending physician's report, autopsy report, microscopic examination report, and toxicology report from various sources. (*Id.* at 485, 494, 499–525, 537–51, 561–68, 570–75, 578, 580.)

Defendant referred the case to an internal physician advisor, Dr. R. Norton Hall. On August 28, 2008, Dr. Hall concluded that the records failed to clarify the cause of death. (*Id.* at 481–82.) Subsequently, on September 4, 2008, Dr. Hall wrote another report stating that the "medical review reveals the insured suffered a severe hypoglycemia of .24 mg as found by EMS responders. This level would at least produce unconsciousness or even death." (*Id.* at 479.)

Defendant then referred the file to independent forensic pathologist Dr. J. Scott Denton on September 12, 2008. (*Id.* at 477.) Dr. Denton found that Mr. Ball became unresponsive from heart disease while in the swimming pool, noting the findings of the autopsy with relation to the Mr. Ball's enlarged heart, atherosclerotic stenosis, and the pallor of the myocardial papillary muscle. (*Id.* at 474.) He found that the weight of the heart, at 490 grams, is just below the critical 500-gram weight, known to cause sudden death without any contributing factors. (*Id.*) According to Dr. Denton's report, the increased cardiac muscle mass requires more oxygenation during work, but the blocked coronary arteries prevent efficient delivery of oxygenated blood to this myocardium, which can cause sudden death. (*Id.*) Additionally, he noted the cocaine metabolites in Mr. Ball's blood, and indicated that cocaine use can cause sudden cardiac death with someone with Mr. Ball's heart conditions. (*Id.*) Dr. Denton concluded that "severe

4

coronary atherosclerosis, enlargement of his heart from hypertension, and cocaine intoxication[] are the most likely cause of his sudden cardiac arrest and becoming unresponsive in the pool." (*Id.*)

Citing the evidence reviewed and Dr. Denton's findings, Defendant denied Plaintiff's claim for accidental death benefits on October 20, 2008, and notified her of her right to appeal this decision. (*Id.* at 451–58.)

### D. Defendant's Denial of the Appeal

Plaintiff appealed Defendant's decision on October 9, 2009. (*Id.* at 288–309.) She cited an attached report by a consulting pathologist, Dr. Paul Redelat, who found that petechial hemorrhages around Mr. Ball's eyes indicated breath-holding prior to drowning, rather than sudden death by myocardial infarction. (*Id.* at 295–96, 311–12.) Dr. Redelat found it unsurprising that no water was found in the lungs, as it can move rapidly into the bloodstream in drowning deaths, and also found the water in Mr. Ball's stomach to be consistent with a gulping action when he was holding his breath. (*Id.*) He also noted that the post-mortem examination "in no way supports the disingenuous allegation of 'cocaine intoxication' since this metabolite lingers in the body long after the active principle of cocaine has been degraded." (*Id.*) "The role played by the pre-existing coronary atherosclerosis is difficult to assess and, in my opinion, remains entirely speculative." (*Id.*)

Plaintiff also provided a transcript of the sworn testimony of Dr. Luisa Florez, who performed the autopsy. (*Id.* at 296–305; 319–63.) Dr. Florez believed that there was no evidence that Mr. Ball experienced an acute myocardial infarction, as she did not see any microscopic signs of necrosis in the heart tissue, which she would expect to see with an acute infarction. (*Id.* at 297, 333–34.) She confirmed that the fact that the report lists "Contributory

5

Causes" as "[h]ypertensive and atherosclerotic cardiovascular disease and diabetes mellitus" does not mean those conditions contributed to the drowning in any way. (*Id.* at 301, 344–46.) Rather, the diagnosis of drowning is one of exclusion with no consistent pathologic findings, because Dr. Florez could not say that he in fact had an infarct while underwater. (*Id.* at 345.)

Defendant asked an independent toxicologist, Dr. Fred Fochtman, to analyze the level of cocaine metabolite benzoylecgonine found in Mr. Ball's blood. (*Id.* at 36.) He noted that chronic cocaine use can cause myocardial tissue damage. (*Id.* at 32.)

An independent cardiologist, Dr. Paul W. Sweeney, also looked at the record at Defendant's request to determine whether Mr. Ball's cardiac condition contributed to his death. He found that the autopsy report and testimony of Dr. Florez strongly suggested that Mr. Ball had "severe cardiac disease" and most likely died as a result of a sudden death due to cardiac dysrhythmia. (*Id.* at 29.) Dr. Florez herself noted that Mr. Ball had suffered at least one prior myocardial infarction, no less than one month prior to his death. (*Id.*) He stated that the diagnosis of drowning was incomplete, as it does not explain how Mr. Ball could have drowned in a pool that was only 5 feet deep. (*Id.* at 30.)

Defendant also forwarded Plaintiff's appeal to Dr. Denton, who supplemented his conclusions. He concluded that Plaintiff's consultants failed to provide an explanation for "why an otherwise outwardly healthy 48 year old man, without any injuries who can swim, drowns in a pool when he could easily stand up to prevent such an occurrence." (*Id.* at 23.) He stated that, "[t]o a reasonable degree of medical certainty[,] Mr. Ball suffered a medical event, mostly likely an arrhythmia from his severe coronary atherosclerosis, or a 'heart attack' while swimming." (*Id.*) The report refuted Plaintiff's primary arguments. Dr. Denton contested the opinion of Dr. Redelat, saying that this concept of "dry drowning" is not proven in forensic pathology literature,

6

and the absence of water found in his airways or lungs is better explained by a sudden cardiac arrhythmia causing Mr. Ball to become unconscious and unable to stand and support himself in the water. (*Id.* at 24.) Additionally, he stated that "[i]t is well known and taught in basic pathology text books that the signs of heart muscle necrosis or myocardial damage with inflammation from severe coronary atherosclerosis causing a 'heart attack' requires at least 6 to 12 hours of survival in the alive patient to manifest grossly or microscopically at autopsy." (*Id.*) As Mr. Ball did not survive minutes beyond his cardiac arrest, it was unsurprising that Dr. Florez did not see microscopic signs of necrosis in the heart tissue. (*Id.*) Dr. Denton also stated the presence of the parent drug cocaine in the blood is not necessary for a finding of cocaine intoxication; cocaine readily spontaneously hydrolyzes to the breakdown product benzoylecgonine even after death. (*Id.*)

On November 19, 2009, Defendant denied Plaintiff's appeal and upheld its previous denial based on the Policy's definition of "covered loss" and exclusions for losses caused directly or indirectly, in whole or in part, from "Sickness, disease, bodily or mental infirmity" and "voluntary ingestion of any narcotic." (*Id.* at 10–17.) Ms. Clay then filed suit in this Court for wrongful denial of benefits under § 1132 of ERISA.

## II. LEGAL STANDARD

### A. Summary Judgment Standard

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

7

of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court may not make credibility determinations or weigh the evidence. *Harvill v. Westward Communications*, L.L.C., 433 F.3d 428, 436 (5th Cir. 2005). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Additionally, any "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Abuse of Discretion Review

If an ERISA plan gives an administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan,[3] the Court reviews the administrator's factual

---

[3] Parties do not dispute that the Plan gave the Plan Administrator discretion to determine eligibility for benefits and to construe the terms of the plan. (*See* Def.'s Mot. at 13; Pl.'s Mot. at 5.)

determinations and construction of plan terms for abuse of discretion. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Wade v. Hewlett-Packard Development Co. LP Short Term Disability Plan*, 493 F.3d 533, 540-41 (5th Cir. 2007), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co*, --- U.S. ----, 130 S. Ct. 2149, 2157–58 (2010). "Abuse of discretion is synonymous with the arbitrary and capricious standard." *Wade*, 493 F.3d at 540; *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 298 (5th Cir. 1999). The Court must "focus on whether the record adequately supports the administrator's decision." *Vega*, 188 F.3d at 298. "To avoid reversal in the summary judgment context, the Administrator's decision must be supported by substantial evidence in the administrative record, which is evidence that a reasonable mind might accept as sufficient to support a conclusion." *Wade*, 493 F.3d at 541 (citing *High v. E-Systems*, Inc., 459 F.3d 573, 576 (5th Cir. 2006)); *see also Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007) ("Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). A decision is arbitrary "only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Meditrust Financial Services Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (citing *Bellaire General Hospital v. Blue Cross Blue Shield*, 97 F.3d 822, 828–29 (5th Cir. 1996)). A claim must be upheld so long as it was "based on evidence, even if disputable, that clearly supports the basis for its denial." *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 342 (5th Cir. 2002), *abrogated on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (quoting *Vega*, 188 F.3d at 299).

Where there is evidence that the administrator acted under a conflict of interest, the Court must "weigh the conflict of interest as a 'factor in determining whether there is an abuse of

9

discretion' in the benefits denial." *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008) (quoting *Glenn*, 554 U.S at 115). A plan administrator that "both evaluates claims for benefits and pays benefits claims" creates a structural conflict of interest that the Court must take into account in determining whether the administrator's actions were an abuse of discretion. *Glenn*, 544 U.S. at 112. However, "[i]f claimants do not present evidence of the degree of the conflict, the court will generally find that any conflict is 'not a significant factor.'" *McDonald v. Hartford Life Group Ins. Co.*, 361 Fed. Appx. 599, 608 (5th Cir. 2010) (quoting *Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 249 (5th Cir. 2009)). Additionally, consulting physicians cannot be considered inherently biased based solely on their employment with a contracting agency. *McDonald*, 361 Fed. Appx. at 609; *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601 n.14 (5th Cir. 1994).

### III. ANALYSIS

Plaintiff does not contend that Defendant's interpretation of the relevant plan language was legally incorrect.[4] Instead, Plaintiff argues that Defendants' factual determination of the contributing causes of Mr. Ball's death was arbitrary and capricious, and thus that Defendant was incorrect in determining that Mr. Ball's death was not due to a "covered accident." "[T]he question of the cause of death [is] a factual determination." *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 213 (5th Cir. 2009).

---

[4] While Plaintiff states that "LINA's interpretation of the meaning of 'contributing' in reference to a covered accident is arbitrary and capricious, or in the alternative, ambiguous" (Resp. to Def.'s Mot. at 4), it does not appear that Plaintiff actually disagrees with Defendant's interpretation of the word "contributing." Plaintiff's only argument is that the diseases or injuries listed on the death certificate as "contributory causes" cannot automatically be said to have "contributed" to his death. However, as noted above in the statement of facts, Defendant did not rely solely on the list of contributory causes in making this determination; it enlisted the help of many physicians to determine whether Mr. Ball's heart condition, diabetes, or cocaine use contributed to his death. Moreover, the causal link required under the policy is very loose; Defendant may deny a claim for an incident "which, *directly, or indirectly, in whole or in part*, is caused by or results from . . . 7. Sickness, disease, bodily or mental infirmity . . . [or] 11. voluntary ingestion of any narcotic, drug, poison, gas or fumes, unless prescribed or taken under the direction of a Physician and taken in accordance with the prescribed dosage." (Administrative R. at 647.)

The evidence, outlined above, shows that Defendant primarily relied on the opinions of Dr. Denton, Dr. Sweeney, and Dr. Focthman in determining that "Mr. Ball suffered a medical event, which occurred due to his medical conditions as well as his recent cocaine use." (Administrative R. at 15.) Defendant also reviewed the appeal submitted by Plaintiff, including her consulting physicians, and other reports prepared about the incident. Defendant did not "arbitrarily refuse to credit a claimant's reliable evidence"; its consulting physicians expressly considered, and rejected, the medical opinions offered by Plaintiff through Dr. Radelat and Dr. Florez. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). As explained above, the physicians that Defendant credited described why Mr. Ball's death may have been caused by cocaine use, despite the absence of the parent drug cocaine in his blood sample. They drew conclusions different from Dr. Florez's observations about Mr. Ball's heart, and contested her testimony that she would expect to see microscopic signs of necrosis in the heart tissue even in someone who had died minutes after a myocardial infarction. Dr. Denton also contested Dr. Redelat's theory of "dry drowning," stating that the absence of water found in his airways or lungs is better explained by a sudden cardiac arrhythmia. Dr. Sweeney noted that Dr. Florez's diagnosis of "drowning" is one of exclusion with no consistent pathologic findings.

Dr. Florez's testimony was not due more weight because she was the physician who examined Mr. Ball. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003 ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."); *Gooden v. Provident Life & Accident Ins., Co.,* 250 F.3d 329, 335 (5th Cir. 2001) (holding that the plan administrator did not abuse its discretion by relying upon the assessment of

11

a physician who had not examined the plaintiff, as the plaintiff's condition could be verified from the objective medical information). Defendant was faced with competing testimony—Dr. Florez stated that she could rule out a myocardial infarction with a reasonable degree of medical certainty (Administrative R. at 352–53), while Dr. Denton believed, to a reasonable degree of medical certainty, that "Mr. Ball suffered a medical event, most likely an arrhythmia from his severe coronary atherosclerosis." (*Id.* at 23.) Dr. Sweeney agreed with Dr. Denton. It was not an abuse of discretion to credit these physicians after considering Dr. Florez's and Dr. Redelat's testimony. *See, e.g.*, *Corry*, 499 F.3d at 401 (noting that an administrator "is vested with discretion to choose one [expert] over the other."); *Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246, 249–50 (5th Cir. 2007) ("[P]lan fiduciaries are allowed to adopt one of two competing medical views . . . ."). Plaintiff asks the Court to do precisely what it cannot under its limited review—rely only "on the death certificate signed by the Medical Examiner, the autopsy, the toxicology reports and the testimony of the pathologist who performed the autopsy." (Pl.'s Mot. at 15.)

Moreover, Plaintiff has provided no evidence of an actual, as opposed to a structural, conflict of interest of either Defendant or its consulting physicians. Unlike *Glenn*, Plaintiff has presented no evidence that Defendant took "inconsistent positions [that] were . . . financially advantageous" and otherwise failed to consider and provide its experts with relevant evidence. *Glenn*, 554 U.S. at 118. Accordingly, the Court finds that this conflict is "not a significant factor," and it does not change the Court's determination that Defendant's decision did not constitute an abuse of discretion. *McDonald*, 361 Fed. Appx. at 608.

The Court finds, therefore, that Defendant's determination that Mr. Ball's death was not a "covered accident" did not constitute an abuse of discretion. There was a choice to be made

12

based on the evidence presented, and Defendant was entitled to rely on the opinion of its consulting physicians. Defendant need not have evidence that "the heart attack was the probable cause of [Mr. Ball's] death"; its decision "need only evince a 'rational connection between the known facts and the decision.'" *Brown v. PFL Life Ins. Co.*, 111 Fed. Appx. 258, 261 (5th Cir. 2004) (quoting *Lain*, 279 F.3d at 342). Defendant's conclusion "fall[s] somewhere on a continuum of reasonableness—even if on the low end." *Corry,* 499 F.3d at 398 (citation and internal quotations omitted).

## IV. CONCLUSION

For the reasons stated in this order, Defendant's Motion is **GRANTED**, and Plaintiff's Motion is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 23rd day of March, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

13